IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHRISTOPHER B. CORDEIRO, | ) | Civ. No. 11-00413 JMS-BMK |
| | ) | |
| Plaintiff, | ) | ORDER (1) GRANTING DEFENDANT |
| | ) | ANTHONY VASQUEZ'S MOTION TO |
| vs. | ) | DISMISS COUNT XIV, DOC. NO. 60; |
| | ) | (2) DENYING DEFENDANT |
| UNITED STATES OF AMERICA; | ) | ANTHONY VASQUEZ'S MOTION |
| Officer WESLEY CORTEZ, | ) | FOR SUMMARY JUDGMENT ON |
| individually as a Department of | ) | THE BASIS OF QUALIFIED |
| Defense Navy Police Officer; Officer | ) | IMMUNITY, DOC. NO. 59; AND |
| ANTHONY VASQUEZ, individually | ) | (3) DENYING DEFENDANT WESLEY |
| as a Department of Defense Navy | ) | CORTEZ'S MOTION FOR SUMMARY |
| Police Officer; et al., | ) | JUDGMENT BASED ON QUALIFIED |
| | ) | IMMUNITY, DOC. NO. 62 |
| Defendants. | ) | |
| _____ | ) | |

**ORDER (1) GRANTING DEFENDANT ANTHONY VASQUEZ'S MOTION TO DISMISS COUNT XIV, DOC. NO. 60; (2) DENYING DEFENDANT ANTHONY VASQUEZ'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY, DOC. NO. 59; AND (3) DENYING DEFENDANT WESLEY CORTEZ'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY, DOC. NO. 62**

## I. INTRODUCTION

In the early morning of June 29, 2009, Department of Defense

("DOD") police officers Wesley Cortez ("Cortez") and Anthony Vasquez

("Vasquez") (collectively "the officers") stopped Plaintiff Christopher Cordeiro

("Plaintiff" or "Cordeiro") while he was driving on Roosevelt Avenue, in the

Kalaeloa area of Oahu, near the former Barbers Point Naval Air Station.  Many of the salient details of the traffic stop and subsequent arrest are disputed.  It is undisputed, however, that Cortez sprayed Cordeiro's face twice with mace (pepper spray);[1] and the officers forcibly removed Cordeiro from his vehicle, handcuffed him, and eventually arrested him.  After federal criminal charges against Cordeiro were dropped (allegedly for lack of jurisdiction), Cordeiro filed this twelve-count civil rights action against the United States of America, and against the officers individually.  Vasquez and Cortez have filed Motions for Summary Judgment, raising an affirmative defense of qualified immunity as to Cordeiro's Fourth Amendment claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[2]  Doc. Nos. 59, 62.  Based on the following, the Motions for Summary Judgment are DENIED.

---

[1]  The court (as do the parties throughout these proceedings) uses the terms "mace" and "pepper spray" interchangeably.

[2]  Vasquez also filed a Motion to Dismiss Count XIV, which alleges a claim for violations of the Fourteenth Amendment.  Doc. No. 60.  He argues that the Fourteenth Amendment (which concerns actions by *states*, not the federal government) cannot apply in this action against federal actors only.  *See, e.g.*, *Erickson v. United States*, 976 F.2d 1299, 1300 n.1 (9th Cir. 1992) ("We are aware of no authority approving a constitutional tort action against a federal official for a violation of the fourteenth amendment, which applies by its terms only to state action.").  Plaintiff did not file an Opposition to Vasquez's Motion to Dismiss, and conceded at the hearing that Count XIV should be dismissed as to all Defendants.  Accordingly, the court GRANTS Vasquez's Motion and DISMISSES Count XIV with prejudice.

## II. <u>BACKGROUND</u>

**A.   Factual Background**

For purposes of these summary judgment motions, the court views the evidence in the light most favorable to the non-moving party.  *See, e.g.*, *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270 (9th Cir. 2011).  And because the Motions are limited to assessing whether Vasquez and Cortez are entitled to qualified immunity as to Plaintiff's Fourth Amendment claim, the court focuses on the objective evidence (again, viewed in the light most favorable to Plaintiff) of the perspective of those officers.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene[.]").  Given these principles, the court bases its rulings on the following factual background.

**1.   *The Safety Check Incident, and Plaintiff's Refusal to Stop***

On June 29, 2009, at about 2:10 a.m., Plaintiff was driving home from Kalaeloa Beach, near the former Barbers Point Naval Air Station, in the Kapolei area of Oahu.  Doc. No. 74, Pl.'s Decl. ¶ 2.  Plaintiff was traveling on an isolated part of Coral Sea Road, which was dark with no street lights.  *Id.* ¶ 4.  In his rearview mirror, Plaintiff noticed a vehicle rapidly approaching him from behind.  *Id.*  Plaintiff was traveling at or below the speed limit when the vehicle began

3

tailgating him.  The vehicle slowed down, then accelerated, and again tailgated

Plaintiff.  *Id.* ¶¶ 7, 9.  Plaintiff assumed the vehicle "was a bunch of kids,

irresponsible teens."  *Id.* ¶ 10; Doc. No. 63-3, Pl.'s Depo. at 65.

The vehicle then illuminated blue flashing lights.  Doc. No. 74, Pl.'s

Decl. ¶ 11.  Plaintiff looked back and noticed that the vehicle was not marked as a

Honolulu Police Department ("HPD") vehicle, but was instead a pickup truck.  *Id.*

¶ 14; Doc. No. 63-3, Pl.'s Depo. at 68.  He admits that his safety check had

expired, and that he had been pulled over in the past for having an expired check,

but it did not occur to him at the time that he was being pulled over for an expired

check.  Doc. No. 63-3, Pl.'s Depo. at 39-40, 106.

Plaintiff was not sure who was following him or whether it was a law

enforcement vehicle at all.  Doc. No. 74, Pl.'s Decl. ¶ 15.  In fact, however, it was a

DOD police vehicle driven by Vasquez.  *Id.* ¶ 29.  Plaintiff states that he had heard

of at least three occasions of individuals impersonating police or security personnel

near campgrounds in that area.  *Id.* ¶ 16.  "Knowing it was not an HPD vehicle, and

traveling in a dark and secluded area of Coral Sea Road, [he] felt it would be

extremely unsafe to stop on Coral Sea Road, a road with no street lights."  *Id*. ¶ 17.

Plaintiff did not stop, and instead slowed to about ten miles per hour.  *Id.* ¶ 18.  He

claims that he planned to drive to a shopping center located two and a half miles

away.  *Id.*  He "wanted to just get to a safe area and have someone witness what was going on."  Doc. No. 63-3, Pl.'s Depo. at 80.  Other than slowing, however, there is no indication he communicated that intent to the driver of the truck that was following him.  But he contends that "[a]t no time did I increase my speed, nor make any aggressive and/or evasive movements to make the officer believe I was fleeing[.]"  Doc. No. 74, Pl.'s Decl. ¶ 20.

Still going about ten miles per hour, Plaintiff turned from Coral Sea Road onto Roosevelt Avenue.  He then saw another pickup truck with blue lights, traveling toward him in his lane and flashing its high beams at him.  *Id*. ¶¶ 24-25.  This second vehicle was also a DOD police vehicle, driven by Cortez.  *Id.* ¶ 26.  Plaintiff "immediately pulled half way off the paved lane and came to a complete stop."  *Id.* ¶ 27.  Vasquez and Cortez, wearing a type of police uniform, approached Plaintiff's vehicle.  At that point, Plaintiff admits he realized that they were DOD police officers, not impersonators.  Doc. No. 63-3, Pl.'s Depo. at 81.  (Plaintiff also admits that he had previously seen Navy police officers patrolling in that area in pickup trucks.  *Id.* at 106.)

### 2.  *Plaintiff Refuses to Exit his Vehicle, and Requests HPD Assistance*

Plaintiff remained in his vehicle, and rolled the window down.  Doc. No. 74, Pl.'s Decl. ¶ 29.  Vasquez, who had been in the trailing vehicle,

"immediately and aggressively approached the driver's side of [Plaintiff's] window and started shouting 'get out of the vehicle and lay on the ground!'"  *Id.* Vasquez did not identify himself as a police officer, and did not ask Plaintiff for any "paperwork" such as his driver's license or identification.  *Id.* ¶ 39; Doc. No. 63-3, Pl.'s Depo. at 88.  Plaintiff then asked Vasquez "why do I need to get out of my car and lie on the road?  what happened?"  Doc. No. 74, Pl.'s Decl. ¶ 32; Doc. No. 63-3, Pl.'s Depo. at 88.  "I questioned him why.  What did I do[?]  Identify me first."  Doc. No. 63-3, Pl.'s Depo. at 90.  He states, "I can recall questioning him humbly with respect why [do] I need to get out of the vehicle and lay on the ground."  *Id.* at 91.  Vasquez, however, continued to instruct Plaintiff to just get out of the vehicle and lay face down.  Doc. No. 74, Pl.'s Decl. ¶ 31.

Plaintiff attests that "[f]eeling threatened and harassed, I picked up my phone to call 911 as I knew I was on City and County of Honolulu land and thus under HPD jurisdiction."  *Id.* ¶ 33.  He testified that "I told [Vasquez] you need to call HPD to witness this."  Doc. No. 63-3, Pl.'s Depo. at 92.  Vasquez ordered Plaintiff to put his cell phone down, saying "HPD was not needed for assistance."  Doc. No. 74, Pl.'s Decl. ¶ 34.[3]  Plaintiff put his cell phone down

---

[3]  Cortez, who was driving the second vehicle, testified that he knew the officers did not have jurisdiction where they were, and that Vasquez was not in distress:

(continued...)

[3](...continued)

Q.  In 2009, do you know what the perimeters of, what we're calling, the Kalaeloa area is?

A.  As far as I know, Coral Sea was not ours, but where we landed, uh, I believe that wasn't ours.

Q.  What do you mean where you landed?

A.  Where everybody stopped.

. . . .

Q.  And you said that it wasn't ours, the Coral Sea Road and the area where you, Officer Vasquez, and the Plaintiff, Mr. Cordeiro, stopped.

A.  I believe so.

Q.  Whose was it?

A.  HPD.

Q.  Were you aware of that at the time that you came to a stop with Mr. Vasquez?

A.  Yes.

Q.  And why did you stop Mr. [Cordeiro] if you knew that you didn't have jurisdiction?

A.  Just to back my officer up.

Q.  Do you have any idea why Mr. Vasquez stopped him?  Do you know if Mr. Vasquez knew that that was not Navy jurisdiction?

A.  He had just started so he didn't know the fine line jurisdiction areas yet.

. . . .

A.  . . .  It was just basic protocol that we back our officers up.

Q.  And why is that?

A.  Officer safety.

Q.  If you know that an officer is not abiding by the jurisdiction of the Navy police, you still back them up?

A.  If he's in distress, yes.

Q.  Was Mr. Vasquez in distress?

A.  No.

Q.  May the record reflect the witness is laughing.

[Counsel for Defendants]:  That's not an accurate description.

. . . .

Q.  . . . And why did you laugh or chuckle[]?

. . . .

A.  Because I knew right away that this was going to go south. What I mean by that, it first started off with a safety check, and that's not a big deal, to chase somebody down on Coral Sea,

(continued...)

7

without calling 911.  Doc. No. 63-3, Pl.'s Depo. at 85-86.

Plaintiff refused to exit his vehicle, explaining several times that he wanted to wait until HPD officers arrived.  Doc. No. 74, Pl.'s Decl. ¶ 36.  Plaintiff states that "as a result of the DOD officers['] refusal to call local law enforcement, I felt unsafe, vulnerable and harassed."  *Id.* ¶ 37.  "I refused to exit my vehicle as I had committed no crime."  *Id.* ¶ 35.  "I was just thinking they got the wrong person."  Doc. No. 63-3, Pl.'s Depo. at 94.  "I was just afraid.  The way they stopped me and the way they approached me I just was afraid."  *Id.* at 97.  Plaintiff again asked Vasquez to call HPD, but Vasquez responded "HPD is not needed."  Doc. No. 74, Pl.'s Decl. ¶ 42.

### 3.    *The Uses of Force*

Plaintiff contends that "[a]t this point I asked [Vasquez] if they knew who I was, since they never asked me for my driver's license or vehicle documentation."  *Id.* ¶ 44.  Vasquez replied, "It doesn't matter . . . Just get out of the f***ing vehicle! . . .  You're not complying with us.  Get out of your vehicle NOW!"  *Id.* ¶¶ 44, 46.  When Plaintiff did not comply, Vasquez removed his sidearm and pointed it at Plaintiff's face, and again yelled, "[g]et out of your

---

[3](...continued)
obviously, that's not the way I would have ran that situation.

Doc. No. 74-1, Cortez Depo. at 67-70.

vehicle now and lay down with your arms spread!" *Id.* ¶ 47.

Plaintiff describes being shocked with having a pistol pointed at his face, claiming that "I then calmly, peacefully asked [Vasquez] 'Are you going to shoot me?'" *Id.* ¶ 50. He states that "I crossed my arms and sat back as [Vasquez] continued to point his pistol at my head." *Id.* ¶ 51. "I asked, in a soft, calm voice: 'Why are you pointing your gun at me?' After hearing this again, [Vasquez] yelled in an intimidating tone: 'Get out of the car now or I'm going to shoot you!'" *Id.* ¶ 54. Plaintiff claims he then told Vasquez: "Bruddah . . . you better put your gun back in the holster before you lose your job tomorrow!" *Id.* ¶ 55.

After pointing his firearm at Plaintiff for about two minutes, Vasquez re-holstered the firearm. *Id.* ¶ 56. Cortez, who had approached in the meantime, then walked around Vasquez "from the back and grabbed something from his belt." *Id.*[4] Cortez then pointed a "black looking object" at Plaintiff's face. Plaintiff heard Vasquez say "something like 'shoot,'" *id.* ¶ 57, and Cortez then sprayed Plaintiff's face twice with pepper spray. *Id.* ¶ 58. Plaintiff testified that his vehicle was in park, with the ignition off, and that he never took the keys out of the ignition. Doc. No. 63-3, Pl.'s Depo. at 111-12. Although Defendants have

---

[4] It is unclear from Plaintiff's declaration whether Cortez grabbed "something" from Cortez's belt or Vasquez's belt. In his deposition, Plaintiff confirms that Cortez took pepper spray from his own belt. *See* Doc. No. 63-3, Pl.'s Depo. at 111.

argued that the use of pepper spray was justified because Plaintiff was reaching for unknown items in the dark cab of the car, Doc. No. 76, Vasquez Mem. at 4, the spraying occurred -- construing the evidence in the light most favorable to Plaintiff -- several minutes after Plaintiff had put his cell phone down, after Vasquez put the gun away, and while Plaintiff "sat back" with "crossed arms," Doc. No. 74, Pl.'s Decl. ¶ 51, or while Vasquez was holding Plaintiff's left arm.  Doc. No. 74-1, Cortez Depo. at 115.

Vasquez and Cortez then pulled Plaintiff out of his vehicle and handcuffed him.  *Id.* at 117; Doc. No. 74, Pl.'s Decl. ¶¶ 61-62.  "The handcuffs were clamped so excessively tight[] on [Plaintiff's] wrists that deep bruising occurred that lasted for two and [one] half weeks."  Doc. No. 74, Pl.'s Decl. ¶ 62.  Vasquez then yelled "Why don't you just comply!  You should take your dumb ass back to Puerto Rico where you belong!"  *Id.* ¶ 63.  Plaintiff's vehicle had a Puerto Rican flag hanging from the rear view mirror, and a "Puerto Rican Pride" sticker on the driver side rear window.  *Id.* ¶ 64.  (The Complaint alleges that Plaintiff is "of Puerto Rican descent."  Doc. No. 1, Compl. ¶ 73.)

Despite using pepper spray, Cortez testified that Plaintiff was not a threat to him (at least at some points in time):

Q. . . .  Does [Plaintiff] turn around to pick up his keys

10

because his keys were behind him, right?[5]

A.  Yes.

Q.  At that point, what do you tell him to do?

A.  I keep telling him to stop, get away from your vehicle, and try to get him on the ground.

Q.  How did you try to get him on the ground?

A.  Just verbal commands still yet because he wasn't a threat.
. . . .
Q.  And why wasn't Mr. [Cordeiro] a threat at the time?

A.  No weapons, it was just verbal abuse to us anyway, at the time.
. . . .
Q.  So you didn't hear him and understand him to say anything physically aggressive like he wanted to fight with you guys?

A.  Fight?  All I heard him say were a few swear words: F*** you guys, you guys are pigs, nothing that I hear that he wanted to be physical with me.

Doc. No. 74-1, Cortez Depo. at 100-01.  As for his use of pepper spray, Cortez

describes the incident as follows (again, appearing to have not been in immediate

threat of harm):

---

[5]  Cortez provides a different account of events.  He claims that Plaintiff threw his keys out the window of his car, and later stepped out of his vehicle (about three feet away) and retrieved them.  Doc. No. 74-1, Cortez Depo. at 98-99.  Cortez claims that when he picked up his pepper spray, Plaintiff "started the car and lunged toward me." *Id.* at 99.  Cortez then "[kept] telling him to stop, get away from your vehicle, and tr[ied] to get him on the ground." *Id.* at 100.

A.  I was aiming for the forehead.

Q.  And do you know where you hit?

A.  Somewhere on the head.

Q.  And at the time Officer Vasquez is holding his left arm, Mr. Cordeiro is still in the car, at that time?

A.  I believe so, yes.
. . . .
Q.  Is he still holding Mr. Cordeiro's left arm?

A.  I believe so.

Q.  And why did you spray Mr. Cordeiro with Mace?

A.  Very belligerent, resisting arrest.  I sprayed him so that we can immobilize him, search him, for our safety.

Q.  Was he being physically resistant?

A.  Yes, for a short time then it.  [sic]

Q.  What does that mean, a short time?

A.  Well, when you touch somebody you're going to automatically, you know, brush them off or push them off.

Q.  So you're telling me when Mr. Vasquez grabbed Mr. Cordeiro's arm, he flinched or reacted by pulling his arm back or something like that?

A.  Yes.

Q.  And would you say that's a natural reaction?

A.  Natural reaction.

Q.  Would you say that's initiating some sort of fight?

A.  No.

Q.  Would you say you were threatened by Mr. Cordeiro?

[Government counsel]:  Objection, vague as to time.

Q.  Were you threatened at the time Mr. Cordeiro's left arm was being held by Mr. Vasquez?

A.  No.

*Id.* at 114-15.  Cortez also testified that Plaintiff was never a threat "as a criminal":

Q.  Were you trained to allow a suspect, after he's been handcuffed and suspected of a crime and a felony stop has occurred, to get on his feet and he's been sat on the ground with his hands cuffed behind his back?

A.  Well, I didn't think of him as a criminal then because this was just a safety check issue.

Q.  Thank you.  And so was Mr. Cordeiro a threat to you?

[government counsel]:  Objection, vague as to time.

Q.  Was Mr. Cordeiro ever a threat to you during this whole incident?

A.  Him a threat to me?

Q.  Yes.

A.  As a criminal, no.

13

*Id.* at 134-35.  Later, Cortez was again asked at his deposition: "Did Mr. Cordeiro ever threaten you?," and he answered, "Did he ever threaten me, no."  *Id.* at 136.

Plaintiff claims that he was kept lying face down on the road with an officer's knee on his back for approximately an hour before an ambulance arrived.  Doc. No. 74, Pl.'s Decl. ¶ 68.  He attests that, "[a]t no time was I physically combative or resisting being removed from my vehicle and handcuffed."  *Id.* ¶ 69.  He claims that, "[t]he only thing on my mind was the burning sensation to my eyes and face resulting from being sprayed with mace."  *Id.* ¶ 70.  He asked officers to clean the mace off his face, but "[t]he officers refused . . . and stated that they would be calling for an ambulance shortly."  *Id.* ¶ 71.[6]  He states:  "I also requested

---

[6] Cortez testified that he allowed Plaintiff to stand up after being handcuffed, but agrees that he refused to clean Plaintiff's face:

> Q.  So then you allowed Mr. Cordeiro to stand up on his feet on the side of the road?
> A.  Yes.
> Q.  What happens next?
> A.  I believe he asked me if I could wipe his face down with a cloth.  I think I said no because I didn't have one, to my knowledge.
> Q.  And then what happened?
> A.  That's it.  I just stood there and watched him.
> Q.  You stood there watching him until the ambulance came?
> A.  Yes.
> Q.  And when the ambulance came what happened next?
> A.  The ambulance then took him to inside their vehicle to decontaminate him.
> Q.  And how long was it between the time that Mr. Cordeiro was sprayed with Mace, in you estimation, to the time that EMT's

(continued...)

that the officers loosen my handcuffs at least three (3) times as I could feel

throbbing in my wrists, but they would not." *Id.* ¶ 72.  Plaintiff was then escorted

by DOD officers to a military installation in West Loch or Iroquois Point.  *Id.*

¶¶ 77, 79; Doc. No. 63-3, Pl.'s Depo. at 132.

### 4.   *Other Relevant Background*

During the incident, Plaintiff attests that "[o]nce thrown on the ground

I felt someone remove my wallet from my back right pocket."  Doc. No. 74, Pl.'s

Decl. ¶ 65.  He alleges that "I would later be charged with driving without a

driver's license and would come to find my license in the bushes next to the street

where I was assaulted.  Thus, the police took my license out of my wallet and

threw it in the bushes to create a charge against me."  *Id.* ¶ 67.

Plaintiff contends that, while leaving the military police station later

that morning, Vasquez apologized to him:  "[Vasquez] stuck out his right hand

toward me and apologized.  [Vasquez] said, 'Bro, I'm sorry for having to do what I

did man, you just weren't cooperating.'"  *Id.* ¶ 92.  When Plaintiff asked Vasquez

---

[6](...continued)
        arrived?
        A.  I'd say about 30 to 45, I believe.  I'm not sure.
        Q.  And at what time were the EMT's called?
        A.  I have no idea.

Doc. No. 74-1, Cortez Depo. at 135-36.

"Why you guys had to mace me or put the gun to my head for?," Vasquez

answered, "you just weren't cooperating, bro."  *Id.* ¶¶ 93, 94.

Plaintiff also alleges that when he went back to retrieve his vehicle, it

had been moved from Roosevelt Avenue where the encounter took place (as

confirmed by ambulance and other reports) in an area that is under HPD

jurisdiction, to a location on the nearby Federal Navy Golf Course (which is

apparently under federal jurisdiction).  *Id.* ¶¶ 103, 106-07, 115-16.  He claims that

there were no signs of forced entry to the vehicle, and thus only someone with the

keys could have moved it.  *Id.* ¶¶ 108-109.  His vehicle had been searched, with

property thrown on the front seat, with damage to his fishing gear.  *Id.* ¶ 110.  He

claims that an eyewitness informed him that he saw "two officers searching my

vehicle at about 4:30 a.m. on the date of the incident."  *Id.* ¶ 115; Doc. No. 63-3,

Pl.'s Depo. at 203.

He alleges that "[a]s a result of the fact that the two officers . . .

illegally apprehended me and obviously gave false reports that couldn't hold water,

my federal case was later dismissed by the United States Attorney because the

Department of Defense officers were enforcing outside their jurisdiction and had

no arresting powers."  Doc. No. 74, Pl.'s Decl. ¶ 124.

He summarizes:  "During my entire encounter with the DOD Officers

I never made any threatening statements to the officers.  I was calm and only wanted to protect myself from their threatening behavior and have HPD officers witness what was taking place, which I believed was my rights as I was on HPD jurisdiction."  *Id.* ¶ 125.[7]

## B.   Procedural Background

Plaintiff filed this action on June 24, 2011.  Doc. No. 1.  On June 14, 2013, Vasquez filed (1) a Motion for Summary Judgment on the Basis of Qualified Immunity, Doc. No. 59, and (2) a Motion to Dismiss Count XIV, Doc. No. 60.

---

[7]  The court takes judicial notice of its court records confirming that a criminal Information was filed against Plaintiff on August 3, 2009.  Doc. No. 1, *United States v. Cordeiro*, Cr. No. 09-00308 (D. Haw. Aug. 3, 2009).  The Information alleged a count of violating Hawaii Revised Statutes § 286-102 (applicable under 18 U.S.C. § 13), for "knowingly operat[ing] a motor vehicle without first being appropriately examined and duly licensed as a qualified driver," and three counts of violations of 18 U.S.C. § 111, which provides:

> (a) In general.  -- Whoever --
> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title [any officer or employee of the United States] while engaged in or on account of the performance of official duties; or
> (2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,
> shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

*Id.*  The docket also reflects that, on December 1, 2009, the government dismissed the Information without prejudice "in order to allow the Government to conduct further investigation."  Doc. No. 14 at 2, *United States v. Cordeiro*, Cr. No. 09-00308 (D. Haw. Dec. 3, 2009).  Whatever investigation followed, no new charges were filed.

The same day, Cortez filed his Motion for Summary Judgment based on Qualified Immunity.  Doc. No. 62.  Plaintiff filed an Opposition to both summary judgment Motions (but not as to the Motion to Dismiss Count XIV) on September 9, 2013, Doc. No. 71, and Replies were filed on September 16, 2013.  Doc. Nos. 75, 76. The court heard the Motions on September 30, 2013.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

18

carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

   "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

///

///

19

# IV. **DISCUSSION**

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The court applies a two-step analysis in determining whether an officer is entitled to qualified immunity:  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 235-236 (2009)).  Second, the court analyzes whether the right was "clearly established," assessed "in light of the specific context of the case, not as a broad general proposition." *Id.*  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.  The court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

///

///

20

## A.      Standards for Assessing Constitutionally Excessive Force

Plaintiff alleges a *Bivens* claim against federal officers, raising

violations of the Fourth Amendment, which prohibits the use of excessive force

during an arrest.  *Graham v. Connor*, 490 U.S. 386, 394-95, 398 (1989); *see also*,

*e.g.*, *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012).  The court

examines the objective reasonableness of a particular use of force to determine

whether it was "excessive."  *Graham*, 490 U.S. at 394-95, 398; *Maxwell*, 697 F.3d

at 951.  To assess objective reasonableness, the court weighs "the nature and

quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation

and internal quotation marks omitted).  "The question is not simply whether the

force was necessary to accomplish a legitimate police objective; it is whether the

force used was reasonable in light of *all* the relevant circumstances."  *Smith v. City*

*of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting *Hammer v. Gross*,

932 F.2d 842, 846 (9th Cir. 2005)).

### 1.      *Nature and Quality of the Intrusion*

The court "begin[s] by analyzing the quantum of force -- the type and

amount of force -- that [the officers] used against [Plaintiff]."  *Bryan v.*

*MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010) (citation omitted).  The focus in

this case is on the use of pepper spray, pointing of the gun, and the manner in which the handcuffs were used.

      a.     *Pepper spray*

      "Pepper spray 'is *designed* to cause intense pain,' and inflicts 'a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx,' as well as 'disorientation, anxiety, and panic.'" *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1162 (9th Cir. 2011) (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199-1200 (9th Cir. 2000), *vacated and remanded on other grounds*, 534 U.S. 801 (2001)) (other citations omitted).  It is a form of force "capable of inflicting significant pain and causing serious injury." *Id.* at 1161.  As such, it is "regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests." *Id.* (citing *Smith*, 394 F.3d at 701-02, and *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003)).

      Further, deliberately causing a suspect to "suffer unnecessarily [by] prolonged exposure to the pepper spray" can also constitute excessive force. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).  *LaLonde* addressed a situation where officers left pepper spray on a suspect's face and in his

eyes, "for twenty to thirty minutes after he had already surrendered and was under control," *id.*, and concluded that, although the use of pepper spray may be reasonable as a general policy to bring an arrestee under control, "in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a . . . refusal without cause to alleviate its harmful effects constitutes excessive force." *Id.* at 961.

      *b.*     *Pointing a loaded hand gun*

      "[T]he pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury." *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007) (citing *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc) ("[A]s a general principle . . . pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger.")). *See also Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (reiterating that "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force").

      *c.*     *Tight handcuffs*

      Plaintiff's claim is not directed at the use of handcuffs per se, but at the application of their use in this instance.  In this regard, "[a] series of Ninth

Circuit cases has held that tight handcuffing can constitute excessive force."

*LaLonde*, 204 F.3d at 960 (citing *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir.

1993), and *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989)).  "The issue of tight

handcuffing is usually fact-specific and is likely to turn on the credibility of the

witnesses." *Id.  See Palmer*, 9 F.3d at 1436 (rejecting qualified immunity where

the officer handcuffed the plaintiff so tightly that he suffered pain and bruises).

### 2.   *Governmental Interest in Use of Force*

*Graham* provides a non-exhaustive list of factors a court considers in

assessing the governmental interests at stake in relation to a use of force, including

"the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "Because the test

of reasonableness under the Fourth Amendment is not capable of precise definition

or mechanical application," the reasonableness of a seizure must instead be

assessed by carefully considering the objective facts and circumstances that

confronted the arresting officers.  *Id.*  In some cases, for example, the availability

of alternative methods of capturing or subduing a suspect may be a factor to

consider.  *Smith*, 394 F.3d at 701 (citing *Chew v. Gates*, 27 F.3d 1432, 1441 n.5

(9th Cir. 1994)).

"[T]he 'most important' *Graham* factor is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Smith*, 394 F.3d at 702). When considering whether there was an "immediate threat," "a 'simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'" *Id.* at 441-42 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)).

"[A]ctive resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders.  To the contrary, where an individual's 'resistance was [not] particularly bellicose,' [the Ninth Circuit has] held that various applications of force, including the use of pepper spray, . . . were not reasonable." *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Smith*, 394 F.3d at 703, and citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ("*Headwaters II*")).  *See, e.g.*, *Young*, 655 F.3d at 1165-66 (concluding that an arrestee's repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan*, 630 F.3d at 829-30 (reasoning that an arrestee's cursing and muttering to himself and exiting his vehicle despite being told to stay in car was not active resistance).

"If the evidence, reviewed in the light most favorable to [plaintiff],

could support a finding of excessive force, then the defendants are not entitled to summary judgment." *Smith*, 394 F.3d at 701. "'Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.") (citations omitted).

**B.    Application of *Saucier***

   *1.    Did the Officers Violate a Constitutional Right?*

   The use of pepper spray, pointing of firearms, and handcuffs are all potentially significant or high levels of force that can cause serious pain. *See, e.g.*, *Young*, 655 F.3d at 1162 (pepper spray); *LaLonde*, 204 F.3d at 961 (prolonged exposure to pepper spray; handcuffs); *Robinson*, 278 F.3d at 1014-15 (pointing loaded firearm). Thus, "there is no question that [such] use against an individual is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162-63.

   And here, in analyzing the government interest at stake, genuine

26

issues of material fact exist under *Graham* as to whether Vasquez and Cortez used

constitutionally-excessive force when arresting Plaintiff.  That is, viewing the

evidence in the light most favorable to Plaintiff, the *Graham* factors all indicate an

excessive use of force.  It is thus for a trier-of-fact to decide whether the officers

violated the Fourth Amendment.

First, both officers admit that the original crime at issue -- an expired

safety check -- was not severe.  And they do not assert that Plaintiff was otherwise

violating a law by refusing to stop when he was being followed by Vasquez (and

he was not charged with such a violation), or for refusing to exit his vehicle after

being ordered to do so.  The only relevant crime, for purposes of *Graham*, is an

expired safety check, which is, without more, not severe enough to require a

significant use of force such as pepper spray, threatening the use of a firearm, or

the use of tight handcuffs.  *See, e.g.*, *Bryan*, 630 F.3d at 828 ("Traffic violations

generally will not support the use of a significant level of force.") (citation

omitted).  Moreover, even if the court considers Plaintiff's failure to obey a law

enforcement officer's order as a crime, "such conduct still [generally] constitutes

only a non-violent misdemeanor offense that will tend to justify force in far fewer

circumstances than more serious offenses[.]"  *Young*, 655 F.3d at 1165 (citations

omitted).

Second, in considering the "most important" *Graham* factor --

whether the individual posed an immediate threat to an officer or the public safety -

- Plaintiff was not a threat at all to the officers when force was applied.  According

to Plaintiff, he was sitting in his car with this hands crossed.  Although he refused

to get out of his vehicle, he had no weapons and was repeatedly telling the officers

to call HPD.  Indeed, as set forth in detail above, there is ample evidence based on

Cortez's own testimony that he did not consider Plaintiff a threat.  *See, e.g.*, Doc.

No. 74-1, Cortez Depo. at 114-15.  Rather, Cortez applied pepper spray because

Plaintiff was "[v]ery belligerent, resisting arrest." *Id.* at 114.  Cortez said he

"sprayed him so that we can immobilize him, search him, for our safety." *Id.*

Although Cortez might dispute the context in which he made his statements, such a

dispute simply creates a genuine issue of material fact.  It is not enough for him to

simply claim that force was needed "for our safety." *See Young*, 655 F.3d at 1163

("[A] simple statement by an officer that he fears for his safety or the safety of

others is not enough; there must be objective factors to justify such a concern.'")

(quoting *Deorle*, 272 F.3d at 1281).[8]

---

[8] Although the officers contend that their use of force was justified because they faced "attempted battery of a law enforcement official," Doc. No. 75, Cortez Reply at 8 (citing to Cortez's testimony that Plaintiff "lunged" his car at the officers), Plaintiff's version of the facts is much different, and the court must accept the non-moving party's evidence at this summary judgment stage.

Moreover, Cortez admitted that he refused to make any effort to alleviate Plaintiff's pain for well over half an hour (Plaintiff claims it was about an hour), when Plaintiff was suffering from the effects of pepper spray -- even *after* Plaintiff was handcuffed and could not have been a threat to anyone.  *See LaLonde*, 204 F.3d at 961 (indicating that deliberate and "prolonged exposure to pepper spray" constitutes excessive force when "officers left the pepper spray on [the arrestee's] face and in his eyes for twenty to thirty minutes after he had already surrendered and was under control").  Cortez acknowledged that "he just stood there and watched him," Doc. No. 74-1, Cortez Depo. at 135, after Plaintiff asked Cortez to wipe his face.  Construing the evidence in Plaintiff's favor, the officers watched Plaintiff suffer for thirty minutes to an hour, while he lay handcuffed on the ground, doing nothing while Plaintiff's eyes burned from the pepper spray.  Thus, even if the officers were justified in *using* the pepper spray, there is (at least) a question of fact as to whether such force was applied excessively.  And likewise, the officers have not rebutted Plaintiff's evidence that the use of handcuffs was excessive, even after Plaintiff complained to the officers three times about their tightness.  Doc. No. 74, Pl.'s Decl. ¶ 72.

Finally, reviewing the third *Graham* factor, questions of fact remain as to whether Plaintiff was "actively resisting arrest or attempting to evade arrest

by flight." *Graham*, 490 U.S. at 396.  When Plaintiff was sprayed, he was (according to Plaintiff) sitting in his car with "his hands crossed."  Doc. No. 74, Pl.'s Decl. ¶ 51.  He attests that "[a]t no time was I physically combative or resisting being removed from my vehicle and handcuffed."  *Id.* ¶ 69.  Even accepting Cortez's version, Vasquez had Plaintiff's left arm under control when Cortez sprayed Plaintiff.  And, again, Cortez testified that at that moment Plaintiff was not a threat, much less was not "attempting to evade arrest by flight."  *See* Doc. No. 74-1, Cortez Depo. at 115 ("Q.  Were you threatened at the time Mr. Cordeiro's left arm was being held by Mr. Vasquez?  A.  No.).[9]

_____

[9]  At oral argument, the officers emphasized the facts in *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), *overruled by Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc).  In *Brooks*, a pregnant driver (stopped for speeding in a school zone) refused to sign a speeding ticket, became unruly, and refused to leave her car to be arrested.  599 F.3d at 1020-21.  Officers applied a taser to Brooks after she "stiffened her body and clutched the steering wheel in order to frustrate her removal from the car."  *Id.* at 1021.  A three-judge panel upheld the use of force, commenting in part that "a suspect who repeatedly refuses to comply with instructions to leave her car escalates the risk involved for officers unable to predict what type of noncompliance might come next."  *Id.* at 1028-29.  The officers contend that such behavior, which they liken to Plaintiff's refusal to exit his vehicle here, constitutes "active" resistance.  *Brooks*, however, does not answer the question before the court.

Initially, to the extent the officers rely on the three-judge panel opinion, it has been overruled and "shall not be cited as precedent by or to any court of the Ninth Circuit."  *Brooks v. City of Seattle*, 623 F.3d 911 (9th Cir. 2010) (Order that the case be reheard en banc).  In overruling *Brooks*, *Mattos* indeed stated that Brooks "actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car."  *Mattos*, 661 F.3d at 446.  (In contrast, there is no evidence here that Plaintiff "stiffened his body" or "clutched his steering wheel" to resist being removed from his vehicle.)  In any event, *Mattos* nevertheless determined that "[a] reasonable factfinder could conclude . . . that the officers' use of force was unreasonable and therefore constitutionally excessive."  *Id.*  On those facts, *Mattos* reasoned that

(continued...)

30

Cortez and Vasquez emphasize that Plaintiff had "evaded arrest" for several minutes or longer by not stopping after Vasquez first approached Plaintiff's vehicle.  But Plaintiff testified that he was driving at slow speed, making no attempt to flee.  And even if there is some question whether Plaintiff's failure to stop constituted "attempting to evade arrest by flight" under *Graham*, the uncontroverted evidence indicates that Plaintiff had come to a stop for several minutes and was sitting in his car, telling the officers to call HPD, when he was maced (which is the relevant point in time).  That is, he was not attempting to flee when force was used.[10]

_____

[9](...continued)

Brooks was not a threat:

> At no time did Brooks verbally threaten the officers.  She gave no indication of being armed and, behind the wheel of her car, she was not physically threatening.  At most, the officers may have found her uncooperative and her agitated behavior to be potentially threatening while Brooks's keys remained in the ignition of her car.  In theory, she could have attempted to drive away rapidly and recklessly, threatening the safety of bystanders or the officers.  But at some point after Ornelas grabbed Brooks's arm and before Jones applied the taser to her, Ornelas removed the keys from Brooks's car ignition and the keys dropped to the car's floor.  Thus, at the time Jones applied the taser to Brooks, she no longer posed even a *potential* threat to the officers' or others' safety, much less an "immediate threat."

661 F.3d at 444 (citation omitted).  Applying that logic, even if the court accepts that Plaintiff was "actively" resisting arrest by refusing to exit his vehicle -- which it cannot do under applicable summary judgment standards -- the court would still recognize a disputed question of fact under *Graham* as to whether Plaintiff posed a threat, and thus a factual question would still remain whether the officers used constitutionally excessive force against Plaintiff.

[10]  It is also significant that no warnings were given before Cortez sprayed Plaintiff's face.  *See Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a

(continued...)

In short, there are questions of fact as to whether the officers used excessive force in violation of the Fourth Amendment when arresting Plaintiff. *See, e.g.*, *Young*, 655 F.3d at 1165 ("When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force.").

### 2.   Was the Applicable Law Regarding the Use of Force "Clearly Established" in 2009?

The next step in the qualified immunity analysis is determining whether rights were "clearly established," assessed "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "Because the focus is on whether the officer[s] had fair notice that [their] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.*

---

[10](...continued)
factor to be considered in applying the *Graham* balancing test.").

Here, however, the law as it relates to the specific uses of force at issue in this case was clearly established before the June 2009 incident.  *Gravelet-Blondin v. Shelton*, ___ F.3d ___, 2013 WL 4767182 (9th Cir. Sept. 6, 2013), recently confirmed that "[t]he right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008."  *Id.* at *5 (citing *Nelson*, 685 F.3d at 881) (explaining that cases dating back to 2001 have established that "[a] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force")).

Moreover, "[t]he principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus well-established in 2001, years before the events at issue in this case."  *Young*, 655 F.3d at 1168.  Similar to the present case, *Young* arose out of a minor traffic stop that escalated to an officer's use of pepper spray and a baton against the detainee who disobeyed the officer's order (to *reenter* the vehicle), telling the officer: "I don't feel like sitting in my truck, man."  *Id.* at 1159.  The evidence indicated that the detainee, although refusing to obey (both verbally and by acts) a lawful order of the officer, was not a threat and remained "passive" before force was used.

33

*Young* found the law against the use of force in that situation to have been "clearly established" (as early as 2001):

> Our holding in *Headwaters II* would have provided a reasonable officer in [defendant's] position with specific and unambiguous notice that the use of pepper spray and baton blows constituted excessive force. In *Headwaters II*, we held that police officers employ excessive force in violation of the Fourth Amendment when they use pepper spray upon an individual who is engaged in the commission of a non-violent misdemeanor and who is disobeying a police officer's order but otherwise poses no threat to the officer or others. . . . *Headwaters II*['s] straightforward holding would have provided explicit and unambiguous notice to any reasonable officer in [defendant's] position that the use of intermediate force in general, and of pepper spray in particular, would, under the circumstances as alleged in this case, constitute an excessive response to a suspect's commission of a misdemeanor and disobedience of a police order.

655 F.3d at 1168 (citing *Headwaters II*, 276 F.3d at 1131). *Young*'s reasoning applies with equal force in this case, and the court thus rejects the officers' argument that the law as to the use of pepper spray was not clearly established in June 2009.

Similarly, "[t]he right to be free from excessive force in handcuffing [was] clearly established in [Ninth Circuit] precedent" at least as early as 2003. *Luchtel v. Hagemann*, 623 F.3d 975, 989 (9th Cir. 2010) (citing *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (rejecting qualified immunity because it was

"clearly established" that the amount of force used in handcuffing the plaintiff was excessive).  "This is true even when the plaintiff actively resists handcuffing."  *Id.* (citing *LaLonde*, 204 F.3d at 952, 960).

Finally, "[t]he law of [the Ninth] circuit regarding excessive force as it relates to the use by police officers of drawn firearms was established by the en banc court in [*Robinson* in 2002].  In that case, [the Ninth Circuit] held that 'pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger.'"  *Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009) (quoting *Robinson*, 278 F.3d at 1015).

In short, the relevant law against the alleged uses of excessive force under the circumstances of this case was clearly established in June 2009.  Thus, given questions of fact as to the reasonableness of force, the officers are not entitled to qualified immunity based on the record now before the court.

## V.  <u>CONCLUSION</u>

Much will turn on the actual facts -- for example, whether Plaintiff could have been perceived as a threat to the officers when force was used, and whether he was  truly "passive" (or, instead, whether he was actively resisting arrest).  But, applying traditional summary judgment standards, the court construes

35

the evidence in the light most favorable to Plaintiff.  Accordingly, the Motions for

Summary Judgment on the basis of Qualified Immunity, Doc. Nos. 59 & 62, are

DENIED.  The unopposed Motion to Dismiss Count XIV, Doc. No. 60, is

GRANTED.

      IT IS SO ORDERED.

      DATED:  Honolulu, Hawaii, October 3, 2013.



      /s/ J. Michael Seabright
      J. Michael Seabright
      United States District Judge

*Cordeiro v. United States of America, et al.*, Civ. No. 11-00413 JMS-BMK, Order (1) Granting Defendant Anthony Vasquez's Motion to Dismiss Count XIV, Doc. No. 60; (2) Denying Defendant Anthony Vasquez's Motion for Summary Judgment on the Basis of Qualified Immunity, Doc. No. 59; and (3) Denying Defendant Wesley Cortez's Motion for Summary Judgment Based on Qualified Immunity, Doc. No. 62